*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0085P (6th Cir.)
File Name: 01a0085p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

  *v.*

MICHAEL SMITH,
  *Defendant-Appellant.*

No. 99-3894

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 99-00011—Sandra S. Beckwith, District Judge.

Argued: August 2, 2000

Decided and Filed: March 27, 2001

Before: MOORE and CLAY, Circuit Judges; HOOD,
District Judge.[*]

———————————

## COUNSEL

**ARGUED:** C. Ransom Hudson, ASSISTANT FEDERAL
PUBLIC DEFENDER, Cincinnati, Ohio, for Appellant. Terry
Lehmann, ASSISTANT UNITED STATES ATTORNEY,

---

[*] The Honorable Denise Page Hood, United States District Judge for
the Eastern District of Michigan, sitting by designation.

Cincinnati, Ohio, for Appellee.  **ON BRIEF:**  C. Ransom Hudson, ASSISTANT FEDERAL PUBLIC DEFENDER, Cincinnati, Ohio, for Appellant.    Timothy D. Oakley, ASSISTANT UNITED STATES ATTORNEY, Cincinnati, Ohio, for Appellee.

---

**OPINION**

---

DENISE PAGE HOOD, District Judge.  On January 20, 1999, a federal grand jury sitting in the Southern District of Ohio charged Defendant Michael Smith and five co-defendants with drug-related offenses in a ten-count indictment.  Defendant Smith was named in Counts I, II, and X of the indictment.   Defendant Smith and his co-defendants pleaded guilty to Count I of the indictment, which is conspiracy to possess with the intent to distribute cocaine base and cocaine from October 1, 1998, until January 20, 1999, in violation of 21 U.S.C. § 846.    Count II of the indictment charged that Defendant Smith and James Oglesby unlawfully distributed cocaine base in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(iii) and 18 U.S.C. § 2 on October 8, 1998.   Count X charged Defendant Smith and George Carter with unlawfully distributing cocaine base in an amount in excess of five grams on November 9, 1998, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(iii) and 18 U.S.C. § 2.

On January 21, 1999, Defendant Smith was arrested and held without bond until  a hearing on January 25, 1999. Defendant Smith was arraigned and entered a not guilty plea on January 28, 1999.  Trial was scheduled on March 8, 1999 but was postponed until April 1, 1999, at a pre-trial conference with Defendant Smith's attorney.  On the day of trial, Defendant Smith changed his plea and pleaded guilty to Count I of the indictment, conspiracy to possess with the intent to distribute cocaine base and cocaine.   The government was informed of Defendant Smith's decision to plead guilty late in the day on the eve of trial.  At Defendant Smith's  sentencing hearing on June 30, 1999, he objected to

the inclusion of 5.5 grams of cocaine base in the calculation of his base offense level. Defendant Smith's objection was as follows:

> **Objection No. 1**: The defense counsel objects to paragraphs #44, #45, and #46 of the presentence report. Specifically, the defense objects to Mr. Smith [sic] involvement in the sale of 5.5 grams of crack cocaine. According to Mr. Smith, there was another individual involved in the sale of the 5.5 grams of cocaine known as "the Fatman"; therefore, he feels he is not responsible for this transaction.

It was Defendant Smith's contention that if the 5.5 grams of crack cocaine had been excluded from the calculation of his base offense level, the level would have been thirteen instead of twenty-three. A base offense level of thirteen, coupled with Defendant Smith's criminal history category of V, would have given Defendant Smith 30 to 37 months' imprisonment lessening the 84-105 months of imprisonment imposed.

Defendant Smith's objection was overruled at the sentencing. The district court determined that Defendant Smith was responsible for the additional 5.5 grams of crack cocaine. The district court also determined, based upon Defendant Smith's untimely acceptance of responsibility, he qualified for only a two point reduction and not a three point reduction. Therefore, Defendant Smith's guideline range was 92 - 115 months; he was sentenced to a term of 92 months of imprisonment. Defendant Smith filed a timely notice of appeal.

## I. BACKGROUND

The Drug Enforcement Agency ("DEA") and the Lockland, Ohio and Lincoln Heights, Ohio Police Departments conducted a joint investigation during the late summer of 1997. The state police departments requested assistance from the DEA in handling the growing drug trafficking problem in their towns. A specialized investigative unit known as the

Mobile Enforcement Team ("MET") from Detroit, Michigan was sent to assist in the investigation in September of 1998. The local police officers had discovered during their preliminary investigations that the biggest source of drug trafficking was centered around 608 Walnut Street in Lockland, Ohio. The Walnut address was a two-family, two-story residence. Joseph Oglesby and his family lived on the first floor of the dwelling and Defendant Smith lived on the second floor of the dwelling. The local police had received numerous private complaints of drug sales by Defendant Smith, Oglesby, and Oglesby's son, Joseph Cain, out of 608 Walnut. Persons involved in the drug activity often loitered around the dwelling and purchased drugs primarily from Defendant Smith.

In October of 1998, the MET began targeting individuals involved in drug trafficking at 608 Walnut. Confidential informants were sent to make "controlled purchases" of crack cocaine. On October 9, 1998, the confidential informant purchased $100 worth of crack cocaine from Cain at the 608 Walnut address under the surveillance of the MET. The MET agents observed the confidential informant drive to 608 Walnut, get out of the vehicle and speak briefly with Oglesby. Oglesby informed the informant that Cain was not home, but that Oglesby could sell the informant some crack cocaine. The informant arranged a time and place to meet Oglesby in order to conduct the transaction. Prior to the time that the informant had agreed to meet, agents observed Oglesby talking to Defendant Smith in front of 608 Walnut. Defendant Smith handed Oglesby a small item which was believed to be crack cocaine. At the designated time, Oglesby left and met the informant and gave the informant the package in exchange for $100. The package contained .75 grams of crack cocaine.

On November 8, 1998, during one of the many controlled buys which occurred over the next couple of months, the informant purchased one-half ounce of crack cocaine from Defendant Smith and his co-defendant George Carter. Defendant Smith told the informant to come to 608 Walnut

## IV. CONCLUSION

For the reasons set forth above, we AFFIRM Defendant Smith's judgment of conviction and sentence.

MR. OAKLEY: Nothing from the United States, Your Honor.

THE COURT: Mr. Hudson?

MR. HUDSON: Did you say, I am sorry, Your Honor, did you say before we move beyond that point?

THE COURT: Right. It's my opinion, and I haven't heard anything to the contrary, unless you have something new on the point, that it's going to be my ruling that Mr. Smith is not entitled to the third acceptance or responsibility point reduction because he did not accept responsibility and notify the government in a timely fashion, nor did he provide complete information to the government, and therefore, he does not qualify.

MR. HUDSON: I have no more objections nor any more information on that Your Honor.

(J.A. at 104-05.)

The district court did not err in reducing Defendant Smith's offense level by only two points instead of three for acceptance of responsibility. Pursuant to the sentencing guidelines, a defendant may decrease his offense level by two levels if he "clearly demonstrates acceptance of responsibility for his offense." *See* USSG § 3E1.1(a). In *United States v. Bashara*, 27 F.3d 1174, 1184 (6th Cir. 1994), this Court found that the district court did not err in limiting a defendant's reduction to two levels because the defendant waited until five days before trial to enter his guilty plea. Due to the delay by the defendant, the government was compelled to prepare its entire case for trial. Similarly, Defendant Smith waited until 6:00 p.m. on the eve of trial to notify the government of his decision to plead guilty requiring the government to prepare its entire case as in *Bashara*. In light of the above outlined facts, the district court did not err in limiting Smith's reduction to two levels for acceptance of responsibility.

to make the buy. The surveillance officers observed the informant speaking with Defendant Smith as he leaned out of a second floor window. Defendant Smith was later identified by Officer Watts as the person leaning out of the window because Defendant Smith's identity could not specifically be determined from the video. Officer Watts used binoculars to ascertain the identity of the person with whom the informant was conversing. The agents heard Defendant Smith instruct the informant to come to the rear of the house via an audio wire worn by the informant. The informant met Defendant Smith in the rear of the house where the informant inquired about the purchase price of the half-ounce of crack cocaine. Defendant Smith responded that the cost was $500. The agents heard the informant's conversation with Defendant Smith via the audio wire, and heard the name "Mike" as well as the nickname "Fat", referring to the "Fatman", the nickname of co-defendant Cornelius Ogletree. Defendant Smith instructed the informant to return in approximately half an hour.

The informant returned to 608 Walnut thirty minutes later and found Defendant Smith standing outside of the house with two other individuals, one of which was co-defendant Carter. The agents were only able to audiotape the meeting between the informant and the defendants because any attempt to videotape the meeting would have compromised the investigation. The voices on the audio tape were identified as those of the informant, Defendant Smith and Carter. The other individual was not identified. At the meeting, Defendant Smith instructed the informant to drive to the "Man's Lounge" located in Lincoln Heights. The informant refused stating that he did not want to drive to another location. Defendant Smith turned to Carter and spoke in low tones. Defendant Smith then told the informant to follow him and Carter to the rear of the house. When the group reached the rear of the house, Carter asked the informant if he had a scale. The informant provided Carter with a scale. Carter immediately reached into his pocket and removed a clear plastic bag containing the crack cocaine and handed the bag to Defendant Smith. Defendant Smith

weighed the bag.   The bag was handed to the informant and the informant  handed Carter $500 in exchange.  Carter gave the $500 to Smith.   The bag contained 5.5 grams of crack cocaine.

On January 21, 1999, Smith was arrested as a part of the MET investigation.

## II.  JURISDICTION

Jurisdiction is proper under 18 U.S.C. § 3231 which grants subject matter jurisdiction to United States District courts in cases involving offenses against the laws of the United States. Appellate jurisdiction is invoked pursuant to 28 U.S.C. § 1291.

## III.   ANALYSIS

### A.   Fifth Amendment

Defendant  Smith claims that the district court erred in allowing co-defendant George Carter to assert his Fifth Amendment right not to testify at Defendant Smith's sentencing hearing. "A defendant's challenge to his sentence on constitutional grounds presents a question of law over which this Court should exercise *de novo* review." *United States v. Lloyd,* 10 F.3d 1197, 1220 (6th Cir. 1993).

Co-defendant Carter was called to the stand during Defendant Smith's sentencing hearing. Co-defendant Carter was sworn in immediately thereafter, and acting through counsel, asserted his Fifth Amendment right stating that he did not wish to testify. The prosecution failed to object to the assertion of the privilege stating that Carter may be exposing himself to criminal prosecution if he were to testify. Defendant Smith argued that Carter had already pleaded guilty to Count X of the indictment and made statements to the government regarding the drug transactions and therefore, should not be allowed to assert his Fifth Amendment privilege. In contrast,  Carter's attorney argued that Carter never made statements regarding the issue which Defendant

guilty. Defendant Smith  did not notify the government until the evening before trial. The record reflects the following:

THE  COURT: The  extra  point  for  acceptance  of responsibility under Section 3E1.1(b) may be awarded for either of two reasons; first timely providing complete information  to  the  government  concerning  his  own involvement in the offense; or, second, timely notifying authorities.

Anything  you  would  like  to  say  on  the  issue  of providing complete information to the government?

MR.  OAKLEY  [PROSECUTOR]:  Your  Honor,  we have never spoken to Mr. Smith.  We don't have any information as to what he would say to us.

THE COURT: You agree with that, Mr. Hudson?

MR. HUDSON [DEFENSE COUNSEL]: That would be accurate, Your Honor.

THE COURT: All right.  So clearly Mr. Smith does not qualify under Subsection(b)(1).  The only way he could qualify for the extra point is if, under (b) (2), he timely notified authorities of his intention to enter a plea of guilty, permitting the Court and the government to allocate its resources efficiently.

I think clearly on this record that Mr. Smith is not entitled to that additional reduction under Section (b) (4), timely notification. That would increase his offense level to 24.  And that would move him from a sentencing range of 84 to 105 months, to a sentencing range of 92 to 115 months.

Before we move beyond that point I will give both counsel any - the opportunity to make any comments that they would like.

government's single witness that this Court found clearly erroneous.

In the case at bar, the district court did not engage in speculation when calculating the amount of drugs attributable to Defendant Smith. The court made the individualized inquiry into Smith's involvement in the November 9, 1998 drug transaction that we found lacking in *Meacham*. The district court viewed all the available evidence. The court viewed the videotape, listened to the audiotape, and heard testimony from Officer Watts (who was familiar with Defendant Smith) that he heard Defendant Smith's voice on the audiotape. The district court's findings are distinguishable from the assumptions made by the district court in *Meacham*. Given the entire record, the district court clearly did not err in attributing the 5.5 grams of crack cocaine to Defendant Smith for sentencing purposes. The findings of the district court as to the amount of drugs attributable to Defendant Smith for sentencing purposes were not clearly erroneous.

## C.   Reduction of Smith's Offense Level

The sentencing court's acceptance of responsibility determination is "entitled to great deference on review." USSG § 3E1.1, comment(n.5). This Court reviews "for clear error a district court's finding that a defendant is not entitled to a sentence reduction for acceptance of responsibility." *See United States v. Tilford*, 224 F.3d 865, 867 (6th Cir. 2000). "However, the standard of review is de novo where . . . the only issued presented is the propriety of the application of the reduction to uncontested facts." *Id.*   The reduction of Defendant Smith's offense by two levels instead of three levels for acceptance of responsibility is not error.

At sentencing, Judge Beckwith invited defense counsel to address the issue of whether Defendant Smith was entitled to a three level reduction in his offense level for acceptance of responsibility. Judge Beckwith noted that the additional one level reduction is typically awarded when a defendant promptly notifies the government of his intention to plead

Smith wished to question him.   Carter's attorney further argued that if Carter was compelled to testify, he would be exposing himself to perjury and possible obstruction charges. Defendant Smith was permitted to question Carter while Carter's attorney stood next to him to advise Carter of the appropriate instances   to assert his Fifth Amendment privilege.   Carter answered questions regarding a plea agreement with the government, but objected and asserted his Fifth Amendment rights when questioned about those persons who were present during the November 9, 1998, drug transaction involving the 5.5 grams of crack cocaine. The court sustained the objection.   Defendant Smith, again, attempted to question Carter about the persons involved in the incident, but Carter's attorney objected based upon the same grounds. The objections were again sustained by the court.

On appeal, Defendant Smith argues that the district court erred in allowing Carter to assert his Fifth Amendment privilege regarding the November 9, 1998 events. Defendant Smith argues that, when Carter entered his guilty plea agreement regarding Count X, any privilege against self-incrimination ceased to exist. Defendant Smith relies upon the Supreme Court's recent decision in *Mitchell v. United States*, 526 U.S. 314 (1999) in support of his contention that co-defendant Carter was not entitled to assert the Fifth Amendment privilege.

It is true, as a general rule, that where there can be no further incrimination, there is no basis for the assertion of the privilege. We conclude that principle applies to cases in which the sentence has been fixed and the judgment of conviction has become final. If no adverse consequences can be visited upon the convicted person by reason of further testimony, then there is no further incrimination to be feared.

*Id.* at 326 (citation omitted).

Defendant Smith also offers  *United States v. Pardo*, 636 F.2d 535, 542 (D.C. Cir. 1980) in support of his contention. Defendant Smith claims that the District of Columbia Circuit

found that a co-defendant should have been compelled to testify when called by the defendant where the co-defendant feared no other reprisal from the events in question.

The government argues that the district court properly allowed Carter to assert his Fifth Amendment privilege. It is the government's position that Carter's testimony may have subjected him to additional charges of perjury, obstruction of justice, and possibly false statements to the police. Therefore, according to the government, *Mitchell* and *Pardo* are not applicable to this case.

In *Mitchell*, the Supreme Court resolved the conflict among the circuits created by the Third Circuit regarding whether a convicted defendant could invoke the Fifth Amendment protection against self-incrimination when his testimony at sentencing would have the potential of enhancing his sentence. The Third Circuit had split from those circuits which had held that a defendant convicted but not yet sentenced could invoke the Fifth Amendment privilege against self-incrimination if the testimony sought could be used to enhance the sentence. *Mitchell,* 526 U.S. 314, 321 (1999) (citing *United States v. Kuku*, 129 F.3d 1435 (11th Cir. 1997); *United States v. Garcia*, 78 F.3d 1457 (10th Cir. 1996); *United States v. De La Cruz*, 996 F.2d 1307 (1st Cir. 1993); *United States v. Hernandez*, 962 F.2d 1152 (5th Cir. 1992); *United States v. Bahadar*, 954 F.2d 821 (2nd Cir. 1992); *Bank One of Cleveland, N.A. v. Abbe*, 916 F.2d 1067 (6th Cir. 1990); *United States v. Lugg*, 892 F.2d 101 (D.C. Cir. 1989); *United States v. Paris*, 827 F.2d 395 (9th Cir. 1987)). The Supreme Court, reversing the Third Circuit, held that the petitioner in *Mitchell* "retained the privilege at her sentencing hearing." *Id.* The Court wrote, that "[t]he centerpiece of the Third Circuit's opinion [was] the idea that the entry of the guilty plea completed the incrimination of the defendant, thus extinguishing the privilege." *Id.* at 325. The Court stated, "[w]here a sentence has yet to be imposed, however, this Court has already rejected the proposition that 'incrimination is complete once guilt has been adjudicated.'" *Id.* (quoting *Estelle v. Smith*, 451 U.S. 454, 462 (1981)).

the tape indicates that the person present at the transaction was "the Fatman" (Cornelius Ogletree). Defendant Smith contends that if the audio tape is not considered, the district court is left with nothing but Officer Watts' testimony to support its conclusion that Defendant Smith was present at the time of the November 9, 1998 drug transaction. Defendant Smith contends that the district court erred in solely relying upon the testimony of one officer in finding that Defendant Smith was present at the time of the drug transaction. Defendant Smith relies upon *Meacham.*

*Meacham* held that the district court had clearly erred in relying upon the testimony from a single officer in determining the amount of drugs attributable to the defendants for sentencing purposes. However, *Meacham* did not base its holding solely on this premise. The *Meacham* court was most troubled by the district court's failure to make an individualized inquiry into the nature of the defendants' involvement in the conspiracy when the court determined the amount of drugs attributable to defendants. *See* 27 F.3d at 217. The court stated specifically that:

> While troubled by the somewhat speculative nature of the court's quantity calculation, we are most disturbed by the fact that the district court failed to make individualized findings regarding the scope of the conspiracy and the duration and nature of each defendant's participation in the scheme. The court held a single hearing at which a lone government witness testified, then indiscriminately imported its factual findings concerning the amount of narcotics for which Jones was responsible into the *Meacham* and *Botello* sentencing calculus. Apparently, the district court simply assumed that Meacham and Botello were to be held accountable for all narcotics channeled through the conspiracy. In doing so, the court erred.

*Id.* It was the failure of the district court to differentiate between co-conspirators, not the reliance upon the

concede, along with Mr. Hudson, that neither the video nor the audiotapes are a model of clarity. However, I certainly could make out the name "Michael," from Mr. Oglesby, in response to the question "who is up there," from the confidential informant.

The officer who testified, Agent Watts, indicated that he knew Michael Smith, knew his voice, saw him through a pair of binoculars, which gave him a better view of the person in the window with the distinctive yellow hat, and also recognized his voice.

The quality of the tape is poor, and the speed varies so that at times the voice sounds more like Mickey Mouse than it does anybody else than any of us, think, know in real life. But I still believe that the agent's testimony was credible in that he said he recognized Michael both visually and on the tape. He also indicated that he does know the so-called "fat-man," Cornelius Ogletree, both by sight, and would recognize his voice, and that he did not see him or hear him in the course of this transaction.

And Mr. Smith has not adduced any testimony or evidence to contradict Agent Watts. And while Mr. Hudson [defense attorney] has made an heroic attempt to attack Agent Watts's credibility or observations, nevertheless, I think without success.

I am satisfied at least by a preponderance of the evidence, and actually probably more than that, that Mr. Smith was involved in this transaction.

(J.A. at 100-01.)

On appeal, Defendant Smith argues, that the district court should not have relied upon the audiotape. Defendant Smith contends that because the quality of the audiotape is poor the name "Mike" or "Michael" is hard to discern from the tape. Defendant Smith asserts that there is nothing to show that Defendant Smith is the "Mike" in question. It is Defendant Smith's position that the word "fat" which can be heard on

Carter rightfully invoked his Fifth Amendment right against incrimination even though he had already been sentenced. We held in *In Bank One of Cleveland, N.A. v. Abbe*, that "[a]lthough a defendant pleading guilty to an offense waives the constitutional privilege with regard to the offense admitted, he does not thereby submit 'a blanket waiver as to other offenses that might form the basis of later charges'" regardless of the defendant's sentencing status. 916 F.2d 1067, 1076 (6th Cir. 1990) (citation omitted in *Abbe*) (quoting *United States v. Seaver*, 472 F.2d 607, 611 (6th Cir. 1973)). This Court's reasoning was based upon the potential for later charges, not an enhanced sentence. This Court did go on to consider the effect of the defendant's potential testimony on his sentencing and joined the other circuits in holding that Fifth Amendment self-incrimination rights "continue in force until sentencing." *Id*. at 1075-76.

The district court did not err in allowing Carter to assert his Fifth Amendment privilege against self-incrimination at Defendant Smith's sentencing. The D.C. Circuit held in *Pardo* that the privilege against self-incrimination is lost once a witness has been convicted of the offense with respect to which he fears incrimination, as well as when a witness pleads guilty to the offense in question, rather than being convicted at trial. See *Pardo*, 636 F.2d at 543. The privilege against self-incrimination is also lost where charges or counts of an indictment are dismissed as part of a plea agreement. *Id*. The court reasoned that "[s]ince promises to dismiss charges as part of a plea agreement are binding on the Government, a witness may not be exposed to prosecution on those charges, and the need for the privilege is lost." *Id.* Therefore, a co-defendant could not invoke his Fifth Amendment right regarding the events which surrounded a drug transaction because the co-defendant had already entered into a plea agreement with the government regarding the transaction. *Id.* at 543-44. "At the same time, it is equally true that a witness does not lose his Fifth Amendment right to refuse to testify concerning other matters or transactions not included in his conviction or plea agreement." *Id.* at 544 ("Pleading guilty to a crime does not waive the privilege not

to incriminate oneself at other times in other crimes, any more than conviction of one crime erases the privilege as it relates to others.")

Carter's testimony regarding the November 9, 1998 incident to which he pleaded guilty potentially subjected him to other charges such as perjury or obstruction of justice if the testimony was of a self-incriminating nature, especially since Carter had previously represented that Cornelius Ogletree, not Defendant Smith, was the other person who participated in the November 9, 1998 transaction. Even under *Pardo*, Defendant Smith's argument on this issue fails.

### B. Smith's Responsibility for Additional 5.5 Grams of Crack Cocaine

"When reviewing a district court's sentencing decision, this court will disturb the underlying factual findings only if they are clearly erroneous." *United States v. Hill*, 79 F.3d 1477, 1481 (6th Cir. 1996)(citing 18 U.S.C. §3742(e)); *United States v. Hamilton*, 929 F.2d 1126, 1130 (6th Cir. 1991)); *see United States v. Meacham*, 27 F.3d 214, 216 (6th Cir. 1994) (reviewing a district court's factual findings regarding the amount of narcotics attributable to a defendant for clear error)). A finding of fact is clearly erroneous when "'although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed.'" *United States v. Gort-Di-Donato*, 109 F.3d 318, 320 (6th Cir. 1997) (quoting *United States v. Perez*, 871 F.2d 45, 48 (6th Cir. 1989)).

In order to calculate a base offense level using the sentencing guidelines, the sentencing court must consider those quantities of drugs not specified in the counts of conviction which were part of the same course of conduct or common plan or scheme. *See Meacham*, 27 F.3d at 216 (citing USSG § 1B1.3(a)(2); *United States v. Zimmer*, 14 F.3d 286, 290 (6th Cir. 1994)). "Where the amount is uncertain, the court is urged to err on the side of caution and only hold the defendant responsible for the quantity of drugs

for which the defendant is more likely than not actually responsible." *Id.* (citations and internal quotations marks omitted). "The sentencing court's relevant conduct approximation must be based on reliable information and supported by a preponderance of the evidence." *Id.* (citing USSG § 6A1.3(a)).

The district court found, by a preponderance of the evidence, that the 5.5 grams of cocaine recovered from the November 9, 1998 drug transaction was attributable to Defendant Smith. The court's determination was based upon the testimony of Officer Watts, an officer who worked with the MET. Officer Watts testified that he was personally familiar with Defendant Smith and Cornelius Ogletree. Officer Watts knew that Defendant Smith lived at 608 Walnut Street. Watts had used binoculars to observe the November 9, 1998 encounter with Defendant Smith at 608 Walnut. Officer Watts also heard the informant and Defendant Smith arrange the purchase of one-half ounce of crack cocaine for $500 through an audio recording device. The informant was told to return to 608 Walnut in appropriately thirty minutes, however, Officer Watts was unable to observe the interaction because he was unable to position himself at the surveillance point. Although he was unable to see the transaction, Officer Watts was able to hear the conversation between the informant and Defendant Smith through the audio recording device. Officer Watts testified that he heard the voices of the informant, Defendant Smith and Carter as they attempted to weigh the cocaine. Officer Watts also heard another co-defendant Joe Oglesby. The testimony of Officer Watts, the videotape and the audiotape of the November 9, 1998, were played for the district court at sentencing.

The district court found that the record showed, by a preponderance of the evidence, that Defendant Smith was involved in the November 9, 1998 transaction. The district court stated:

I am satisfied by a preponderance of the evidence that Mr. Smith was involved in this transaction. I have to