**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0658n.06

**No. 08-5751**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**Oct 26, 2010**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellee, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| v. | ) | DISTRICT OF TENNESSEE |
| | ) | |
| VIDALE R. WALKER, | ) | |
| | ) | **O P I N I O N** |
| Defendant-Appellant. | ) | |
| _____ | ) | |

**Before:  GILMAN and WHITE, Circuit Judges; and WATSON, District Judge.**[*]

**MICHAEL H. WATSON, District Judge.**  A jury found Vidale Walker guilty of conspiracy to distribute methamphetamine and two counts of possession of methamphetamine.  In May 2008, the district court sentenced Walker to 384 months' imprisonment.  Walker now appeals the sufficiency of the evidence establishing his participation in the conspiracy and the procedural reasonableness of his sentence.  For the following reasons, we **AFFIRM** Walker's conviction and sentence.

## I.  BACKGROUND

On November 14, 2005, the Tennessee Bureau of Investigations ("TBI") employed a confidential informant, Tina Hughley, to meet Walker at the North 40 Truck Stop in Benton County,

---

[*]The Honorable Michael H. Watson, United States District Judge for the Southern District of Ohio, sitting by designation.

Tennessee, to purchase 55 grams of methamphetamine for $4,000 from Walker. The drug transaction was conducted under the surveillance of TBI agents.

On November 20, 2005, the Benton County Sheriff's Department employed a confidential informant, Jessy Allen, to buy a half ounce of methamphetamine from Walker in an attempted controlled purchase at the I-40 Truck Stop on Interstate 40. After Walker pulled into the parking lot, the police detained him. The police searched and handcuffed Walker, and placed him in the back of a police cruiser. After the officers searched Walker's vehicle and found nothing, they released Walker. Later that evening, the officer whose cruiser Walker had been placed in discovered a bag of methamphetamine under the driver's seat.

In August 2006, a federal grand jury indicted Walker on one count of conspiracy to distribute a controlled substance, in violation of 21 U.S.C. § 846, and on two counts of possession of a controlled substance with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1). In August 2007, the government obtained a superseding indictment charging Walker with the original three counts and an additional count of possession of a controlled substance with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1).

Count One of the Superseding Indictment charged Walker with conspiracy to possess with the intent to distribute methamphetamine. Count Two of the Superseding Indictment charged Walker with possession of 55 grams of methamphetamine with the intent to distribute it on November 14, 2005. Count Three of the Superseding Indictment charged Walker with possession of methamphetamine with intent to distribute it on November 20, 2005. Count Four of the Superseding Indictment charged Walker with possession of 71.3 grams of a mixture containing methamphetamine with the intent to distribute it on November 29, 2005.

In February 2008, Walker proceeded to trial. The government's case included the testimony of several alleged co-conspirators. The co-conspirators' testimony placed Walker and the co-conspirators within a distribution chain of methamphetamine in the Western District of Tennessee. Because it is necessary to the determination of the legal issues in this case, the co-conspirators' trial testimony is briefly summarized below.

Tina Hughley testified that she bought methamphetamine from Walker for herself and other people, and, in so doing, she received free drugs and cash. Hughley began cooperating with law enforcement to mitigate the effect of a new paraphernalia charge, the charge being in violation of her probation for an aggravated burglary and theft charge. In addition to the controlled methamphetamine buy on November 14, 2005, Hughley also conducted a controlled buy on November 29, 2005. During the November 29 buy, Hughley introduced TBI Agent Chestnut, posing as an undercover buyer, to Walker at the Interstate 40 Love's Truck Stop. Hughley and Agent Chestnut got into Walker's vehicle and paid Walker $5,500 for three ounces of methamphetamine.

Karl Carter testified that he drove Hughley to meet Walker in order to purchase methamphetamine. Carter testified that Hughley would then distribute this methamphetamine.

Jessy Allen testified that she met Walker in October or November 2005 through her boyfriend. Allen testified that she bought drugs both for personal use and to sell to other people. She testified that she bought drugs from Walker once or twice a week for six months, purchasing approximately four ounces total over the course of their relationship. Allen testified that she cooperated with police in exchange for the dismissal of pending possession of methamphetamine and possession of paraphernalia charges. Allen testified that she did not split money from her drug

sales with Walker, that she did not receive an extra cut of the drugs, and that Walker did not instruct her on methods of selling methamphetamine or evading arrest.

Jason Forrest, Jessy Allen's boyfriend, testified that he and Allen began purchasing methamphetamine from Walker in the summer of 2005. Forrest estimated that he bought a quarter to a half ounce of methamphetamine from Walker once or twice a week for six months. He both used and sold the methamphetamine. Forrest testified that in the spring of 2006, he purchased a quarter ounce of methamphetamine for an individual from Walker, and later this individual sought to have Forrest purchase a quarter pound for him.

Stormy Moody testified that she began purchasing methamphetamine from Walker in 2005. Eventually she purchased approximately one to two ounces a week. Moody testified that she acted as the middle person in Walker's sales to Heather Kelley, also known as Heather Bledsoe, during the last two months of Moody's relationship with Walker. From this arrangement, Moody could obtain enough methamphetamine to sustain her own drug habit and also benefitted financially. Moody further testified that Walker

> was constantly giving me tips on, you know, ways to do it. I mean there was one time, one occasion that I went to stick it in my bra, and he said, No, you don't do that. You have to keep it in your hand at all times to evade arrest, that before you get caught with it, throw it out the window and then pull over. Just little tips to make me trust him. He was knowledgeable, and I trusted him and what he said.

Moody, Trial Tr. vol. 2, 362, Feb. 7, 2008. Moody testified that her relationship with Walker deteriorated when she attempted to buy a pound of methamphetamine from Walker; Moody paid Walker $16,000, but he never provided the drugs.

Heather Bledsoe testified that around June or July 2006, she began purchasing methamphetamine from Walker after she called him to see if she could buy methamphetamine

directly from him instead of using Moody as a middle person. Bledsoe testified that she would buy a quarter to a half ounce of methamphetamine from Walker with money that she pooled from people, then she would divide the drugs among the people who contributed funds.

After presenting testimony from TBI's laboratory chemists regarding the weights of the methamphetamine found in the packages, the government rested and Walker moved for a judgment of acquittal. The district court denied Walker's motion. Walker did not present any witnesses, rested his defense, and renewed his motion for judgment of acquittal; the district court also denied that motion.

On February 8, 2008, the jury returned its verdict finding Walker guilty on Counts One, Two, and Four of the Superseding Indictment. The jury returned a verdict of not guilty on Count Three.

The district court sentenced Walker to 384 months' imprisonment on all three counts, to be served concurrently, and to four years of supervised release. This timely appeal followed.

## II. DISCUSSION

### A. Sufficiency of the Evidence

Walker first challenges the sufficiency of the evidence to support his conviction for conspiracy to possess with the intent to distribute methamphetamine. The standard of review for a challenge to the sufficiency of the evidence is "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "In making this determination, however, we may not reweigh the evidence, reevaluate the credibility of witnesses, or substitute our judgment for that of the jury." *Id.*

-5-

A conspiracy requires:

(1) An object to be accomplished. (2) A plan or scheme embodying means to accomplish that object. (3) An agreement or understanding between two or more of the defendants whereby they become definitely committed to cooperate for the accomplishment of the object by the means embodied in the agreement, or by any effectual means.

*United States v. Gibbs*, 182 F.3d 408, 420 (6th Cir. 1999) (quoting *United States v. Bostic*, 480 F.2d 965, 968 (6th Cir. 1973)). "[T]o sustain a conviction for conspiracy under 21 U.S.C. § 846, the government must have proved (1) an agreement to violate drug laws, in this case 21 U.S.C. § 841(a)(1); (2) knowledge and intent to join the conspiracy; and (3) participation in the conspiracy." *Martinez*, 430 F.3d at 330 (citing *United States v. Welch*, 97 F.3d 142, 148–49 (6th Cir. 1996)). "[P]roof of a formal agreement is not necessary; a tacit or material understanding among the parties will suffice." *Id.* (internal citations omitted). "The existence of a conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan." *United States v. Salgado*, 250 F.3d 438, 447 (6th Cir. 2001) (citing *United States v. Avery*, 128 F.3d 966, 971 (6th Cir. 1997)). "Once a conspiracy is shown beyond a reasonable doubt, a defendant's connection to the conspiracy[] 'need only be slight, and the government is only required to prove that the defendant was a party to the general conspiratorial agreement.'" *United States v. Deitz*, 577 F.3d 672, 677 (6th Cir. 2009) (citing *Salgado*, 250 F.3d at 447).

Drug distribution conspiracies are often "chain" conspiracies such that agreement can be inferred from the interdependence of the enterprise. One can assume that participants understand that they are participating in a joint enterprise because success is dependent on the success of those from whom they buy and to whom they sell.

*United States v. Henley*, 360 F.3d 509, 513 (6th Cir. 2004) (quoting *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999)). "A buyer/seller relationship alone is not enough to establish participation in the conspiracy, but further evidence indicating knowledge of and participation in the conspiracy can be enough to link the defendant to the conspiracy." *Gibbs*, 182 F.3d at 421–22 (citations omitted). "We also have noted that the government must 'show the willful membership of [a] defendant in the conspiracy, but the government need not prove that the defendant committed an overt act in furtherance of the conspiracy.'" *Deitz*, 577 F.3d at 678 (citing *Gardner*, 488 F.3d at 711).

Walker argues that insufficient evidence exists to sustain the jury's guilty verdict on his conspiracy count. He concedes that a buyer/seller relationship might have existed between him and the various cooperating witnesses, and that the alleged co-conspirators might have had a single object—the acquisition and sale of methamphetamine. Walker, however, alleges the government failed to prove the second and third elements of the *Bostic* test; namely, that (2) a plan or scheme embodying means to accomplish the acquisition and sale of methamphetamine existed, and (3) that an agreement or understanding existed between Walker and the alleged co-conspirators whereby they committed to cooperate for the accomplishment of the acquisition and sale of methamphetamine by the means embodied in the agreement. *See Bostic*, 480 F.2d at 968. Walker insists the transactions were merely buyer/seller relationships, and thus were insufficient to establish a plan or agreement to distribute methamphetamine.

We find no merit in this argument. The evidence when considered in the light most favorable to the prosecution supports the proposition that a rational trier of fact could have found the essential

elements of conspiracy to possess with the intent to distribute methamphetamine beyond a reasonable doubt.

The government presented ample evidence of a conspiracy and Walker's knowledge of and participation in that conspiracy. This evidence included numerous witnesses like Tina Hughley, Stormy Moody, Heather Bledsoe, Jason Forrest, and Jessy Allen, who testified that Walker, at the top of the hierarchical supply chain, supplied methamphetamine to them repeatedly and within the Western District of Tennessee, sometimes on a daily or weekly basis. Corroborated witness testimony established that the co-conspirators distributed the methamphetamine they bought from Walker to others. For instance, Tina Hughley testified that she and Walker had a conversation about how he had the drugs and how she could sell the drugs. Hughley, Trial Tr. vol. 1, 87–88, Feb. 6, 2008. They then created a plan in which Walker would come to Hughley's home, and Hughley would courier money and methamphetamine from "the clients [and] customers" to Walker so that Walker did not have to meet the clients. *Id.* Hughley also testified Walker knew that she bought methamphetamine for others, would follow up with her to make sure the clients "got their dope," and would occasionally run "special[s]" for discounted prices on "eight-ball[s]" of methamphetamine. Hughley, Trial Tr. vol. 1, 104, 111, Feb. 6, 2008; Hughley, Trial Tr. vol. 2, 147, Feb. 7, 2008. Similarly, Stormy Moody testified that Walker encouraged her to increase the amount of methamphetamine she bought from him. Moody, Trial Tr. vol. 2, 362, Feb. 7, 2008. In at least one instance, large amounts of money from multiple people were pooled to purchase a large quantity of methamphetamine from Walker. Moody, Trial Tr. vol. 2, 363, Feb. 7, 2008; Bledsoe, Trial Tr. vol. 2, 386–88, Feb. 7, 2008. "[E]vidence of repeat purchases provides evidence of more than a mere

buyer-seller relationship," and the quantity of drugs may also support an inference of conspiracy. *United States v. Brown*, 332 F.3d 363, 373 (6th Cir. 2003).

Additional testimony was presented that Walker discussed with co-conspirators ways to elude the law, instructions on trade skills, means for "cutting" and packaging methamphetamine, and rules on where and to whom to sell methamphetamine. *See, e.g.*, Moody, Trial Tr. vol. 2, 362, Feb. 7, 2008. *See, e.g.*, *United States v. Robinson*, 547 F.3d 632, 640–41 (6th Cir. 2008) (holding that sufficient evidence supported a § 846 conviction where the witness testified that he and defendant shared a "business relationship," and defendant purchased drugs from the witness once or twice a week, sometimes on credit, over a period of several years); *United States v. Caver*, 470 F.3d 220, 233–34 (6th Cir. 2006) (finding conspiracy where defendants pooled money to purchase drugs, cooperated to evade law enforcement, and engaged in "regular, high-volume drug sales"). Viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the conspiracy beyond a reasonable doubt, including that a vertical pattern of distribution scheme existed between Walker and the co-conspirators to supply drugs to a given area and that the circumstantial evidence demonstrated Walker's understanding of and participation in this common plan to distribute methamphetamine. *See Henley*, 360 F.3d at 513 ("[P]articipants understand that they are participating in a joint enterprise because success is dependent on the success of those from whom they buy and to whom they sell.").

Additionally, Walker claims that the government failed to introduce any evidence that a plan or scheme existed to accomplish the distribution of methamphetamine in the Western District of Tennessee or in Madison County, Tennessee. Pointing to the Superseding Indictment, which alleges a conspiracy to obtain and distribute methamphetamine in the "vicinity of Madison County,

Tennessee," Walker states that no evidence established this venue element. Walker argues that only Tina Hughley's testimony establishes that drug sales were conducted at Walker's behest, and that Hughley never testified that such sales took place in the Western District of Tennessee or in Madison County, Tennessee. But even if Hughley's testimony does not place the conduct between Walker and Hughley within the Western District of Tennessee, Karl Carter testified that he drove Hughley to meet Walker numerous times to obtain methamphetamine at Exit 126 off Interstate 40, which is located in the Western District of Tennessee. As such, evidence was presented to establish the venue element.

In conclusion, any rational trier of fact could have found the essential elements of conspiracy to possess with the intent to distribute methamphetamine. Accordingly, we reject Walker's challenge to the sufficiency of the evidence to support his conviction.

**B. Procedural Reasonableness of Walker's Sentence**

Walker asserts that his 384-month sentence is procedurally unreasonable because the district court erred in its calculation and application of the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G."). Specifically, Walker disputes the weight of the drugs attributed to him, the validity of the three-level enhancement applied for his supervisory role in the conspiracy, and the validity of the two-level enhancement applied for his obstruction of justice.

When reviewing a sentence for procedural reasonableness, the Court must "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence . . . ." *United States v. Moon*, 513 F.3d 527, 539 (6th Cir.

2008) (quoting *Gall v. United States*, 552 U.S. 38, 45 (2007)).  Our "reasonableness review focuses on the factors listed in § 3553(a), one of which is the Sentencing Guidelines themselves." *Id.*  (quoting *United States v. Duckro*, 466 F.3d 438, 442 (6th Cir. 2006))*.*  "[D]istrict courts are required to 'consult' the Guidelines as part of their consideration of the § 3553(a) factors.  We have observed that 'a district court's misinterpretation of the Guidelines effectively means that it has not properly consulted [them].'" *Moon*, 513 F.3d at 539 (quoting *United States v. Hazelwood*, 398 F.3d 792, 801 (6th Cir. 2005)).  A sentence may be procedurally unreasonable where the district court "fails to 'consider' the applicable Guidelines range or neglects to 'consider' the other factors listed in 18 U.S.C. § 3553(a), and instead simply selects what the judge deems an appropriate sentence without such required consideration." *Id.*  "This Court reviews the district court's factual findings in calculating the Guidelines range for clear error, but its legal conclusions are reviewed *de novo*." *United States v. Thompson*, 586 F.3d 1035, 1038 (6th Cir. 2009) (citing *United States v. Galloway*, 439 F.3d 320, 322 (6th Cir. 2006)).

### 1.  *Quantity of drugs attributable to Defendant*

Walker challenges the district court's assessment of the drug quantity attributable to him, and thus by extension, the applicable Guideline range.  Walker argues that the amount of drugs attributed to him was made up "out of whole cloth" and based on unverifiable statements of co-conspirators who lacked veracity.

When calculating a defendant's base offense level under the Guidelines, a sentencing court must consider the quantity of drugs that are part of the same course of conduct or common scheme or plan.  U.S. SENTENCING GUIDELINES MANUAL § 1B1.3(a)(2) (2007); *United States v. Zimmer*, 14 F.3d 286, 290 (6th Cir. 1994).  The Guidelines provide that, "in a drug distribution case,

-11-

quantities and types of drugs not specified in the count of conviction are to be included in determining the offense level if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction." U.S. SENTENCING GUIDELINES MANUAL § 1B1.3(a)(2) cmt. background (2007); *see United States v. Smith*, 245 F.3d 538, 544 (6th Cir. 2001).

"A drug quantity need only be established by a preponderance of the evidence, and an estimate will suffice . . . ." *United States v. Anderson*, 526 F.3d 319, 326 (6th Cir. 2008). "[T]estimonial evidence from a coconspirator may be sufficient to determine the amount of drugs for which another coconspirator should be held accountable." *United States v. Swanberg*, 370 F.3d 622, 625 (6th Cir. 2004) (quoting *United States v. Hernandez*, 227 F.3d 686, 697 (6th Cir. 2000)). "Where the amount is uncertain, the court is urged to err on the side of caution and only hold the defendant responsible for that quantity of drugs for which the defendant is more likely than not *actually* responsible." *United States v. Meacham*, 27 F.3d 214, 216 (6th Cir. 1994) (citations omitted); *see also Zimmer*, 14 F.3d at 290 (holding that a sentencing court "is not free to estimate the 'highest' number possible" or to create an amount "from whole cloth"). A district court's calculation of the amount of drugs attributable to a defendant under the Guidelines "must stand unless it is clearly erroneous." *Henley*, 360 F.3d at 514–15 (citations omitted); *see also United States v. Copeland*, 321 F.3d 582, 606 (6th Cir. 2003); *United States v. Samuels*, 308 F.3d 662, 670 (6th Cir. 2002).

To determine "whether a district court's calculation of drug quantity is clearly erroneous, a key issue is the extent to which the court identified the evidence on which it relied in making that calculation." *Henley*, 360 F.3d at 515 (*comparing, e.g.*, *United States v. Baro*, 15 F.3d 563, 569 (6th Cir. 1994) (vacating defendants' sentences because the district court attributed an extra kilogram of

cocaine without making any factual findings), *United States v. Medina*, 992 F.2d 573, 590–91 (6th Cir. 1993) (vacating sentences because the district court imputed knowledge of the whole extent of the conspiracy to the defendants without making a finding that it was reasonable to do so), *and United States v. Walton*, 908 F.2d 1289, 1302–03 (6th Cir. 1990) (vacating sentences because the district court extrapolated the rate of cocaine dealing without identifying competent circumstantial evidence to support the extrapolation), *with United States v. Ward*, 68 F.3d 146, 150 (6th Cir. 1995) (upholding the sentence where the district judge "clearly spelled out the reasons for his conclusion that Ward was responsible for over 3,000 kilograms of marijuana" and did not speculate as to the quantity), *and United States v. West*, 948 F.2d 1042, 1045 (6th Cir. 1991) (upholding the sentence where the district court's drug quantity determination was based upon testimony that the defendant had been involved in many transactions, each involving over four kilograms of cocaine)).

We find the argument that the district court conceived the amount of drugs "out of whole cloth" unavailing. To begin with, during the sentencing hearing, the TBI agents testified that the witnesses were asked specifically to "be conservative" and to give their "lowest estimate possible" as to the quantity of drugs purchased from Walker. Sentencing Tr. 39. The TBI agents then testified to the amounts each witness conservatively attributed to Walker. For example, TBI Agent Rhodes testified that Heather Bledsoe said "five pounds [of methamphetamine] is probably the minimum she got from" Walker, Sentencing Tr. 16, and that Jason Forrest said "he bought at least two pounds of ice from Walker." Sentencing Tr. 18. These conservative estimates were used in the presentence investigation report's ("PSR") weight calculation. PSR ¶ 28.

Following the presentation of evidence during the sentencing hearing, the district court identified specific evidence that it relied on in calculating the amount of methamphetamine

attributable to Walker. The district court cited both trial testimony and statements that the witnesses gave to the probation officer and TBI agents regarding the frequency and quantity of their drug transactions with Walker, and came to the "conclusion after hearing all the evidence and reviewing the [PSR] that the probation officer has made a conservative calculation of the quantity of drugs for which the defendant is to be held responsible as relevant conduct." Sentencing Tr. 73. The district court adopted the PSR's conservative calculation of drug weights based on the amount and frequency each co-conspirator estimated, PSR ¶¶ 12–17, 28, and found by a preponderance of the evidence that "more than 7.5 kilograms but only slightly more" of methamphetamine was attributable to Walker. Sentencing Tr. 74. Despite exact amounts being undetermined, the approximations suffice to establish drug quantities attributable to Walker. *See Henley*, 360 F.3d at 516 ("[D]rug quantity may be determined by way of estimates or approximations if exact amounts are uncertain.") (citing *Hernandez*, 227 F.3d at 698–99 (upholding a district court's determination that 1,400 pounds of marijuana were involved in the conspiracy based upon testimony that "an accomplice made 7 trips to Saginaw, Michigan from the Rio Grande Valley and delivered 200 pounds on each trip")).

Although Walker asserts that the testimony of the witnesses was incredible, we do not review the credibility of witnesses. *See, e.g.*, *United States v. Roberge*, 565 F.3d 1005, 1009 (6th Cir. 2009). Notably, however, the district court based its findings of credibility on both its individual assessment of the witnesses during trial and the fact that the jury found the witnesses to be credible despite the witnesses' various credibility issues.

Based upon our careful review of the record, we find there to be sufficient evidence to support the district court's calculation of the weight of methamphetamine attributable to Walker, including statements regarding the amount and frequency of purchases of methamphetamine from

Walker, the weighing of the witnesses' credibility by both the jury and the district court, and the conservative nature of the estimates. Accordingly, we find the district court's calculation of the weight of methamphetamine attributable to Walker to be properly supported by the evidence and not clearly erroneous.

### 2. *Three-level enhancement for role as a supervisor in the conspiracy*

Walker disputes the validity of the three-level enhancement that he received pursuant to U.S.S.G. § 3B1.1 for his role as a manager or supervisor of a conspiracy involving more than five persons.[1] Walker asserts that the district court erred in applying the enhancement because the co-conspirators were more akin to independent contractors than employees, and the evidence did not support the finding that he managed the other participants.

The standard of review of a sentencing enhancement for a leadership role pursuant to U.S.S.G. § 3B1.1 is unsettled. "A district court's legal conclusions are generally reviewed de novo, and its factual findings will not be set aside unless clearly erroneous." *United States v. Vasquez*, 560

---

[1] We note the Defendant/Appellant's brief states that the district court erred in increasing the defendant's base offense by four levels and in other places states the base offense was increased by three levels. The Plaintiff/Appellee's brief also incorrectly states the enhancement was four levels.

To clarify, the PSR recommended a three-level increase for Walker's role as a manager or supervisor of a conspiracy involving more than five persons pursuant to U.S.S.G. § 3B1.1(b). The transcript from the sentencing hearing and the sentence reflect a three-level increase for Walker's role as the supervisor of a conspiracy involving more than five persons pursuant to U.S.S.G. § 3B1.1. The district court did, however, during the sentencing hearing interchange "organizer and leader" for "manager or supervisor." The language of "organizer and leader" derives from § 3B1.1(a) and directs a four-level increase. The language of "manager and supervisor" derives from § 3B1.1(b) and directs a three-level increase. Despite the district court's finding that Walker was an "organizer and leader," the district court applied the three-level increase consistent with the probation officer's recommendation in the PSR for Walker's role as a manager or supervisor of a conspiracy involving more than five persons pursuant to U.S.S.G. § 3B1.1(b). Although the district court stated "organizer and leader", it applied the correct three-level increase and thus any error is harmless.

-15-

F.3d 461, 473 (6th Cir. 2009) (citing *United States v. Moncivais*, 492 F.3d 652, 660 (6th Cir. 2007)).

In *Buford v. United States*, the Supreme Court held that the application of the Guidelines by the district court should be reviewed deferentially rather than de novo, "in light of the fact-bound nature of the legal decision." 532 U.S. 59, 66 (2001). This court, however, has "found it unnecessary to determine whether *Buford* requires us to alter the standard of review we apply in reviewing § 3B1.1 enhancements." *Moncivais*, 492 F.3d at 660 (quoting *United States v. McDaniel*, 398 F.3d 540, 551 n.10 (6th Cir. 2005)). Similarly, the instant case does not give occasion for resolving this uncertainty because the enhancement of Walker's Guidelines range is proper under either standard of review.

United States Sentencing Guideline § 3B1.1(b) provides that "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase [the offense level] by 3 levels." U.S. SENTENCING GUIDELINES MANUAL § 3B1.1(b) (2007). Factors that a court should consider in making the determination of whether a defendant qualifies for a leadership enhancement include

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*Id.* at app. n.4; *see United States v. Jeross*, 521 F.3d 562, 579 (6th Cir. 2008). "The standard applied [by the district court] to sentencing factors is preponderance of the evidence." *Jeross*, 521 F.3d at 579 (citing *United States v. Garcia*, 19 F.3d 1123, 1125 (6th Cir. 1994)).

In this case, the district court heard testimony during sentencing from TBI Agents Rhodes and Chestnut as to their interviews with the various co-conspirators. Specifically, TBI Agent Rhodes testified to interviews in which Bledsoe stated that Walker "told me what to do, and he supplied [me]

with drugs", Sentencing Tr. 44, and in which Moody asserted she "felt like he was my boss." Sentencing Tr. 41. TBI Agent Rhodes recounted that Hughley, Bledsoe, and Moody answered that Walker instructed them about quantities and pricing of methamphetamine and "cutting" of the drug to increase the quantity, and directed them as to where and to whom they were not to sell the drugs. Furthermore, Bledsoe and Moody maintained that Walker instructed them on techniques to avoid detection by law enforcement during traffic stops.

The district court found the TBI agents' testimony about the co-conspirators' views of Walker as their boss to be "clear" statements that "he was the leader or the organizer . . . [of] five or more of these co-conspirators . . . ." Sentencing Tr. 74–75. The district court found there were five or more "co-conspirators and witnesses" who were involved in this methamphetamine conspiracy. *Id.* In light of this evidence, the district court applied the three-level enhancement recommended by the probation officer in Walker's PSR.

Walker urges that the enhancement is improper because the relationship with the co-conspirators was a buyer/seller relationship and not a conspiracy. But we have already addressed the sufficiency of the evidence to establish a drug conspiracy in Section II.A and found such argument to be without merit. In any event, a "participant" for purposes of the enhancement is defined as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S. SENTENCING GUIDELINES MANUAL § 3B1.1, cmt. n.1 (2007). Therefore, the testimony of unindicted co-conspirators is properly considered by a district court in determining whether the preponderance of the evidence establishes that a defendant is a manager or supervisor of a conspiracy.

Walker further asserts that the district court erred by not explaining its finding that Walker was the "boss," and by failing to describe Walker's exercise of decision-making authority, how he exercised control over others, and whether he claimed a greater share of the proceeds. We find these arguments to be without merit. As referenced above, ample evidence was presented during sentencing and at trial that Walker exercised control over the supply of methamphetamine. Bledsoe and Moody both affirmatively stated that Walker was their boss. Hughley, Bledsoe, and Moody's testimony all provided corroborating accounts of Walker's instructions and control over to whom and where they could sell drugs, of how to sell the drugs, and that Walker was their main supplier of methamphetamine. TBI Agent Chestnut also testified during sentencing that Jessy Allen and Jason Forrest were told by Walker how to hide the methamphetamine he supplied them if they were stopped by law enforcement officials.

We find this evidence, including the statements of witnesses and the trial testimony, to be sufficient to support the district court's conclusion that a three-level enhancement under U.S.S.G. § 3B1.1(b) for Walker's role was appropriate. Accordingly, the district court did not err in its determination regarding Walker's role in the offense.

### 3. Two-level enhancement for obstruction of justice

Walker disputes the validity of the two-level enhancement he received pursuant to U.S.S.G. § 3C1.1 for obstruction of justice.

"In reviewing a district court's application of obstruction of justice enhancements under [U.S.S.G.] § 3C1.1 (1998), 'we employ a three-step process of review.'" *Vasquez*, 560 F.3d at 473 (quoting *United States v. Roberts*, 243 F.3d 235, 237 (6th Cir. 2001)).

> First, this Court applies a clearly erroneous standard to the district court's findings of fact with respect to the enhancement. Second, a district court's determination of

whether facts constitute obstruction of justice is a mixed question of law and fact that requires de novo review. Third, once there has been a finding that the defendant obstructed justice, application of the enhancement is mandatory, so review of the enhancement at that point is de novo.

*Roberts*, 243 F.3d at 237 (citations omitted).

Section 3C1.1, in pertinent part, provides that:

If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; . . . increase the offense level by 2 levels.

U.S. SENTENCING GUIDELINES MANUAL § 3C1.1 (2007). "U.S.S.G. § 3C1.1 requires the government to prove by a preponderance of the evidence that the defendant 'willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation.'" *United States v. Dunham*, 295 F.3d 605, 609 (6th Cir. 2002) (quoting *United States v. Parrott*, 148 F.3d 629, 635 (6th Cir. 1998)). In the "non-exhaustive" list of examples of types of conduct to which the adjustment applies, an application note instructs that the enhancement is appropriate where a defendant has engaged in "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so[.]" U.S. SENTENCING GUIDELINES MANUAL § 3C1.1, cmt. n.4(a) (2007). Because the obstruction adjustment requires a defendant to act willfully, "the obstruction adjustment applies where a defendant engages in obstructive conduct with knowledge that he or she is the subject of an investigation or with the 'correct belief' that an investigation of the defendant is 'probably underway.'" *United States v. Brown*, 237 F.3d 625, 628 (6th Cir. 2001) (joining the Fifth and Eighth Circuits in finding that, to be "willful," a defendant must have some knowledge of the investigation) (quoting *United States v. Lister*, 53 F.3d 66, 71 (5th Cir. 1995); *United States v. Oppedahl*, 998 F.2d 584, 586 (8th Cir. 1993)).

In this case, during the sentencing hearing, TBI Agents Rhodes and Chestnut testified about statements they took from Hughley, Moody, and Forrest. In her statement, Hughley asserted that Walker told her that if she snitched on him, he would have her killed. Sentencing Tr. 23, 43–44. Similarly, in Moody's interview with Agent Rhodes, she stated that Walker told her she or her children would "disappear" if she told on him. Sentencing Tr. 23–24. TBI Agent Chestnut testified that Walker threatened Forrest that if Forrest "told on" Walker, Walker's friends would "take care of it." Sentencing Tr. 46–47. Forrest also stated to Agent Chestnut that Walker knew that Jessy Allen set Walker up for the controlled buy. *Id.* Forrest stated that Walker threatened that if Forrest and Allen ended their relationship, Walker would "take care of" Allen. *Id.* Walker objected to the enhancement during sentencing, suggesting that the source of the statements was questionable, but admitting that the statements could be considered threats. *Id.* at 6–7.

Walker argues that the statements attributed to him were ambiguous. Citing *United States v. Crousore*, Walker asserts that any "ambiguity should be resolved in his favor to prevent a finding of perjury when the defendant's statement, taken another way, would not have been perjurious." 1 F.3d 382, 385 (6th Cir. 1993). The language of the district court, however, does not suggest that the evidence indicated an ambiguity in Walker's statements. Rather, the district court affirmatively stated that "there were threats made, not just implied threats but direct threats . . . ." Sentencing Tr. 75. The district court found that the enhancement for obstruction of justice was applicable because Walker made threats against various co-conspirators regarding any involvement the co-conspirators might have with law enforcement officials. Because Walker was recently detained by law enforcement and knew who "snitched" on him to the authorities, the district court concluded that there was "clear evidence there was an effort to threaten cooperating witnesses and cooperating co-

conspirators . . . ." *Id.* The district court's finding that these statements were threats is reviewed for clear error and we find no reason to disrupt the district court's ruling. The district court correctly ruled that these threats were made willfully to cooperating parties and constituted an obstruction of justice. Accordingly, the application of the enhancement is mandatory and was properly applied by the district court.

### 4. Procedural Reasonableness of Sentence

After reviewing the drug quantity, the three-level enhancement for Walker's role as a supervisor in the conspiracy, and the two-level enhancement for obstruction of justice, we conclude that the district court did not err in calculating Walker's Guideline range. Accordingly, Walker's sentence is procedurally reasonable and we affirm Walker's sentence to 384 months' imprisonment.

## III. CONCLUSION

For the reasons stated above, we find no merit in Walker's assignments of error and **AFFIRM** his conviction and sentence.